**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------X   **Case No.**
LEILANI MARTIN,

                        Plaintiff,                    **COMPLAINT**

       - against -

NORTHWELL HEALTH, INC.               **PLAINTIFF DEMANDS**
                                      **A TRIAL BY JURY**

                        Defendant.

---------------------------------------------------------------------X

       Plaintiff LEILANI MARTIN ("Plaintiff or "Martin"), by and through her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, against Defendant NORTHWELL HEALTH, INC. ("Defendant"), alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.    Plaintiff complains pursuant to **Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the **New York State Human Rights Law**, NYS Executive Law § 296, *et seq.* ("NYSHRL"), and the **New York City Human Rights Law**, NYC Administrative Code § 8-107, *et seq.* ("NYCHRL") and seeks damages to redress the injuries Plaintiff has suffered as a result of being **discriminated and retaliated against** on the basis of her **race**.

## JURISDICTION AND VENUE

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. § 2000(e) *et seq*.

3.    This Court has supplemental jurisdiction over all state and city law claims pursuant to 28 U.S.C. §1367.

4.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the actions or omissions giving rise to the claims for relief occurred within this judicial district.

## PROCEDURAL PREREQUISITES

5.    Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Opportunity Commission ("EEOC").

6.    Plaintiff received a Notice of Right to Sue from the EEOC, dated December 14, 2022, with respect to the charges of discrimination described herein. A copy of the Notice is annexed hereto as Exhibit "A".

7.    Plaintiff commenced this action within ninety (90) days of receipt of the Notice of Right to Sue.

## PARTIES

8.    At all relevant times herein, Plaintiff Leilani Martin was and is a resident of the State of New York.

9.    As such, at all relevant times herein, Plaintiff was and is a "person" and an "employee" entitled to protection provided by the relevant statutes referenced herein.

10.   At all relevant times herein, Defendant Northwell Health, Inc. was and is a domestic not-for-profit business corporation organized under the laws of the State of New York.

11.   Service of process may be made on the Defendant at the following address: C/O Office of Legal Affairs, Attn: General Counsel, 2000 Marcus Avenue, New Hyde Park, New York, 11042.

12.   At all relevant times herein, Plaintiff was an employee of Defendant.

13.   At all relevant times herein, Defendant employed in excess of fifteen (15) employees.

14.   As such, at all relevant times herein, Defendant was and is an employer covered by the statutes referenced herein.

## MATERIAL FACTS

A. DEFENDANTS ENDORSED A CAMPAIGN OF DISCRIMINATION AND RETALIATION AGAINST PLAINTIFF LEILANI MARTIN SOLELY ON THE BASIS OF HER RACE.

15. On or about November 28, 2016, the Defendants hired Martin as a nurse practitioner.

16. As a nurse practitioner, Martin's initial responsibilities for Defendants focused on ensuring the effective transfer of surgery patients back into their homes and local communities.

17. Martin is an accomplished healthcare professional with over fifteen (15) years of experience as a medical practitioner.

18. Martin holds a Doctorate of Nursing Practice and a Masters of Nursing, among other professional degrees.

19. Martin also serves as a Professor for the Family Nurse Practitioner Program at the City University of New York.

20. Martin predominantly worked in-person at Defendants' medical office located at 110 East 59th Street, Suite 10C, New York, New York 10022 (the "Office").

21. At all relevant times herein, Martin was vocal that she was an African American female.

22. At all relevant times herein, Martin was vocal that she sought to advance within Defendants' organization.

23. Martin was also vocal – at all relevant times herein – that she sought to utilize her skills as a medical practitioner to assist Defendants' staff and patients.

24. At all relevant times herein, Martin earned approximately one hundred and thirty-five thousand dollars ($135,000) per year from Defendants.

25. Throughout Martin's employment with the Defendants, her performance met or exceeded the Defendants' expectations.

26. Indeed, Defendants awarded Martin various salary increases – for each year of Martin's

employment – beginning in or about 2017.

27. However, beginning in or about 2018, Defendants initiated a campaign of discrimination and retaliation against Martin solely on the basis of her race.

28. Specifically, in or around 2018, Hallie Bleu ("Bleu"), an Assistant Vice President of Care Management on behalf of Defendants, while at the Office, commented to Martin about Martin's hair.

29. In particular, Bleu indicated that Martin's hair reminded her of Bleu's "Haitian Nannies."

30. At the time Bleu commented to Martin about her hair, Bleu was aware that it was common for African Americans such as Martin to suffer race-based discrimination based on their natural hair style, including but not limiting to, locs, cornrows, twists, braids, fades, afros, and other hair styles unique to African Americans.

31. Martin's hair – at all relevant times herein –was styled in a curly afro.

32. Bleu, at all relevant times herein, was Martin's supervisor.

33. Bleu, at all relevant times herein, possessed authority to effect personnel decisions on behalf of Defendants, including relating to Martin's employment.

34. In or around 2018, after Bleu's discriminatory comments, Martin complained of discrimination to Dr. Zenobia Brown ("Dr. Brown").

35. Dr. Brown oversees Defendants' clinical programs and is a member of Defendants' senior management team.

36. Subsequent to Bleu's comment regarding Martin's hair, Defendants' staff again discriminated against Martin by singling out Martin due to her hairstyle.

37. Specifically, in or about March 2019, Dina Barbarino ("Barbarino") scoffed at Martin – in front of a group of colleagues while at a conference – by commenting, "is that your hair?"

38. Barbarino, at all relevant times herein, was a nurse practitioner on behalf of Defendants.

39.   Barbarino was also at all relevant times herein Martin's supervisor.

40.   Barbarino, at all relevant times herein, possessed authority to effect personnel decisions on behalf of Defendants, including relating to Martin's employment.

41.   At the time Barbarino commented to Martin about her hair, Barbarino was aware that it was common for African Americans such as Martin to suffer race-based discrimination based on their natural hair style, including but not limiting to, locs, cornrows, twists, braids, fades, afros, and other hair styles unique to African Americans.

42.   In or around 2018, after Barbarino's discriminatory comments, Martin complained of discrimination a second time to Dr. Brown.

43.   Thereafter, Defendants failed to take any action to investigate or otherwise remedy the discriminatory conduct by its staff against Martin on the basis of Martin's race.

44.   Subsequent to the foregoing comments by Martin's supervisors regarding her African American hairstyle, in or around July 2020, Defendants retaliated against Martin due to her race.

45.   Specifically, Defendants denied Martin a promotion to the Nurse Practitioner Supervisor position in or around July 2020.

46.   The promotion instead was granted in favor of Melissa Moscola ("Moscola").

47.   Moscola is a Caucasian female.

48.   Defendants granted the promotion in favor of Moscola and to Martin's exclusion because Martin was African American and made prior complaints to Defendants' staff regarding discrimination on the basis of her race.

49.   In or around August 2020, Defendants again denied Martin a promotion.

50.   During the second round of promotional opportunities, Defendants failed to promote any African American candidates, including but not limited to, Martin.

51. Defendants granted the promotion in favor of Max (last name unknown), Ashleigh (last name unknown), and Stacy (last name unknown), and to Martin's exclusion because Martin was African American and made prior complaints to Defendants' staff regarding discrimination on the basis of her race.

52. Martin complained of race-based discrimination by Defendants to Dr. Ann Flynn ("Dr. Flynn") and other members of Defendants' staff in or around August 2020.

53. Dr. Ann was at all relevant times herein the lead physician.

54. Defendants ignored Martin's complaints of race-based discrimination and otherwise failed to investigate or remedy the disparate treatment towards African American employees of Defendants, including but not limited to, Martin, at all relevant times herein.

55. Defendants retaliated against Martin by denying her various promotions due to her race and because of Martin's prior complaints of discrimination against Defendants.

56. Defendants further demonstrated a practice of disparate treatment and discrimination against African American employees by denying viable and qualified African American candidates' opportunities to advance within Defendants' organization.

B. DEFENDANTS CONTINUED TO DISCRIMINATE AND RETALIATE AGAINST MARTIN EVEN AFTER SHE TRAINED DEFENDANTS' STAFF ON DIVERSITY AND INCLUSION INITIATIVES AND COMPLAINED OF DISCRIMINATION.

57. In or around August 2020, Martin led a diversity and inclusion training on behalf of Defendants.

58. As part of the diversity and inclusion training, Martin trained approximately four hundred (400) colleagues regarding the pitfalls of race-based discrimination.

59. Martin also highlighted potential improvements for Defendants' staff to improve its diversity and inclusion standards.

60. The very next month, in or around September 2020, Defendants retaliated against Martin

for leading the diversity and inclusion training and her prior complaints of race-based discrimination against her.

61.    Specifically, Martin's direct manager, Melissa Moscola ("Moscola"), informed Martin that she was "not meeting her numbers."

62.    Moscola's criticism of and adverse feedback for Martin was rooted in race-based discrimination against Martin due to her status as an African American employee of Defendants that previously reported race-based discrimination to Defendants.

63.    Employee reviews and feedback of Martin by Defendants' staff including but not limited to Moscola were purposefully negative and retaliatory to Martin because Martin – as an African American employee – led diversity and inclusion initiatives on behalf of Defendants and previously complained of race-based discrimination against her.

64.    Prior to the diversity and inclusion training led by Martin, Martin had not received any material adverse feedback regarding her work performance from Moscola or Defendants' staff.

65.    As a result of discriminatory conduct by Defendants' staff, furthermore, Martin was subjected to a hostile work environment permeated with race-based discrimination and retaliatory conduct against her.

66.    Consequently, in or around October 2020, Martin sought to obtain a new position within Defendants' organization so as to avoid the members of Defendants' staff that were discriminating and retaliating against her on the basis of her race, prior complaints, and leader of diversity and inclusion initiatives on behalf of Defendants.

67.    Martin thereafter commenced a new role for Defendants in or around January 2021.

68.    Specifically, in or around January 2021, Martin assumed a nurse practitioner role for the medical tourism practice of Defendants.

69.   As a member of the medical tourism practice, Martin was responsible for providing medical care to patients including diagnosing, treating, assessing and managing a variety of patients' medical conditions.

70.   As part of the transfer to her new role, Martin informed Defendants' staff that she sought to utilize her nurse practitioner's license and skills, in addition to wanting to take on additional responsibilities on behalf of Defendants.

71.   In particular, Martin sought the role with the Defendants' medical tourism practice because that role required a medical practitioner's license to provide care to patients.

72.   However, Defendants' staff sabotaged Martin's attempts to provide medical care to patients in her new role with the medical tourism practice, even though the role required a practitioner to work directly with patients of Defendants.

73.   To Martin's exclusion, other members of Defendants' medical tourism practice that were not African American and who held professional medical degrees were permitted to provide care to and work directly with patients of Defendants.

74.   Furthermore, when Martin commenced her new role with Defendants, in or around January 2021, she was not given an office.

75.   Martin was not provided with an office, let alone, enough space to place her personal effects.

76.   As a result, Martin was forced by Defendants to place her personal effects on the radiator in a lab in the Office.

77.   On the contrary, other non-African American members of Defendants' medical tourism practice each had their own office or a safe space to store their personal effects.

78.   In or around February 2021, Martin's new direct supervisor, Mayra Pincay ("Pincay"), moved Martin's desk next to the medical assistants.

79. Defendants' medical assistants were at all relevant times Martin's subordinates or held junior roles to Martin.

80. Pincay was an administrative supervisor on behalf of Defendants and did not hold any professional medical licenses that would allow her to provide care to Defendants' patients.

81. However, at various times in or around 2021, Pincay initiated or provided medical care to patients and usurped Martin's responsibility to work with those same patients – in violation of Defendants' company policies and procedures.

82. Pincay also purposefully moved Martin's desk next to the medical assistants to create an impression that Martin was *not* a medical practitioner.

83. Pincay attempted to equate Martin's employment background and pedigree to that of Defendants' medical assistants.

84. In or around January and February 2021, Pincay further refused to allow Martin to advertise her credentials, including but not limited to, Martin's Doctor of Nursing Practice degree.

85. Pincay also forbade Martin from mentioning, advertising, or promoting her credentials to patients.

86. Other non-African American members of Defendants' staff that held medical licenses were allowed by Pincay and Defendants' staff to advertise, promote and mention their credentials to patients.

87. Similarly, in or around January and February 2021, Pincay instructed Martin that she would be performing the duties of a medical assistant.

88. Specifically, Pincay instructed Martin to perform administrative duties, mainly, answering phone calls and filling prescriptions.

89. Even further, in or around January and February 2021, Pincay instructed Martin that she "would not see any patients."

90.   From January 2021 through November 2021, Martin was not allowed her own panel of patients despite being qualified to responsibly manage her own panel of patients.

91.   Upon information and belief, the intention was for Martin to have a panel of patients under her name in "Allscripts," the electronic medical record, which would allow Defendants to bill the insurance companies under Martin's name as a provider.

92.   However, a process called "credentialling" must take place prior to a creating a panel for Martin and in the interim, Martin saw patients as a primary care provider. As primary care provider, she ordered diagnostic tests, medications, and referrals, but was unable to bill for the services because her panel in Allscripts was pending completion.

93.   As a result of Martin's inability to bill for the services she provided to patients, significant oversight was required by her supervisors. For example, Dr. Acquista and Pincay had to also see all of the patients Martin saw in order to legally bill the insurance company as the provider.

94.   Despite knowing that Martin was unable to bill for the services she provided to patients but was indeed treating patients, Pincay provided feedback to upper management regarding Martin's work performance suggesting that she did not want to see patients.

95.   Upon information and belief, Nurse Practitioners had the ability to earn up to 10% of their base salary based on metrics solely provided to providers set-up with panels.

96.   Martin's inability to bill for the patients she met with affected her bonus structure and metrics.

97.   Pincay and Defendants' staff purposefully narrowed and limited Martin's role, duties, communications, and credentials due to Martin's race and prior complaints of discrimination to Defendants.

98.   In or around February 2021, Pincay assigned Martin to perform COVID-19 testing at an

outside office belonging to Defendants.

99.     However, Pincay purposefully gave Martin an incorrect address for the outside office.

100.    Pincay was trying to sabotage Martin's work performance on behalf of Defendants due to Martin's race and prior complaints of race-based discrimination to Defendants.

101.    As a result of Pincay's retaliatory conduct, Martin was late to the outside office to perform COVID-19 testing on behalf of the Defendants.

102.    Thereafter, Dr. Angelo Acquista ("Dr. Acquista") – one of Martin's direct supervisors – chastised and penalized Martin for being late.

103.    In March 2021, Dr. Lily Wong – a gynecologist and member of Defendants' staff – instructed Martin that she should omit any mention of her Doctor of Nursing degree when speaking with patients and employees of Defendants.

104.    In or around August 2021, Dr. Acquista gave Martin a permanent space in his office to perform work on behalf of Defendants.

105.    Dr. Acquista did not inform Pincay that he was providing Martin space in his office to work.

106.    Martin was permitted – pursuant to Defendants' company policies and procedures – to work from Dr. Acquista's office.

107.    In or around August 2021, when Pincay discovered Martin's new office space, she inquired to Martin whether Martin had keys to enter the office.

108.    Martin informed Pincay that she was given keys to the office by Dr. Acquista.

109.    Approximately a few days later, Pincay changed all of the locks at the Office, including for Dr. Acquista's office.

110.    Martin was also forced to sit in an old, ripped chair in Dr. Acquista's office.

111.    As a result, Martin, in or around August 2021, requested a new chair from Pincay.

112. Mayra routinely ordered new chairs and supplies for other members of Defendants' staff.

113. However, Mayra, without any explanation to Martin, denied Martin's request for a new office chair.

114. In or around September 2021, Mayra submitted Martin's time sheet docking Martin for five (5) vacation days although she reported to work each day. In response, Martin submitted a request to HR to have her vacation time returned to her.

115. Pincay and Defendants' staff further retaliated against Martin by excluding her from conversations and meetings among Defendants' staff regarding office operations for the medical tourism space.

C. DEFENDANTS FURTHER RETALIATED AGAINST MARTIN BECAUSE SHE WAS AN AFRICAN AMERICAN EMPLOYEE THAT SUFFERED AND REPORTED DISCRIMINATION TO DEFENDANTS ON AT LEAST SEVEN (7) OCCASSIONS.

116. Dating back to in or around 2018, Martin routinely reported discrimination and retaliation on the basis of her race to Defendants and its staff.

117. Martin reported discrimination to Defendants' staff on at least seven (7) occasions.

118. However, since 2018, Defendants have failed to investigate, remedy or otherwise acknowledge Martin's complaints of race-based discrimination.

119. With respect to the discriminatory conduct, hostile work environment and disparate treatment which took place in or around January 2021 in her role for the medical tourism practice, Martin routinely complained of discriminatory conduct and retaliation to Defendants' staff.

120. In particular, with respect to Mayra's discriminatory conduct and disparate treatment against Martin, Martin complained to Defendants' staff on at least four (4) occasions in 2021.

121. Martin complained of race-based discrimination to Betty Gill – Director of Operations for

Defendants – on or about August 2021.

122. Martin complained of race-based discrimination against her to Laura Campisi ("Laura") – a Vice President for Defendants – on or about November 2021.

123. Martin also spoke with members of Defendants' Human Resources department regarding race-based discrimination against her.

124. Specifically, in or around September 2021, Martin sent an e-mail to Kate Raleigh ("Kate") – a member of Defendants' Human Resources department detailing her complaints regarding Pincay's discriminatory conduct. Shortly thereafter, Martin spoke with Kate and Brian Schmith ("Brian") – another member of Defendants' Human Resources, in which Martin was told to escalate her complaint to Betty Gill ("Betty"), Pincay's Director. In response, Martin indicated that she previously escalated her complaints to Betty to no avail and suggested involving Laura, Betty's Director.

125. In or around October 2021, Martin met with Betty and Laura and reiterated her complaints regarding Pincay's discriminatory conduct. To date, Defendant have not provided Martin with a response regarding her meeting with Betty and Laura.

126. At all relevant times herein, Defendant failed to investigate, remedy, acknowledge or take disciplinary action with respect to any complaints made by Martin regarding Pincay or other members of Defendants' staff about race-based discrimination against her.

127. Rather than investigate any of Martin's complaints, including but not limited to Pincay's discriminatory conduct against her and disparate treatment of Martin due to her race, or attempt to remedy the hostile work environment to which Martin was routinely subjected, the Defendants continued to discriminate and retaliate against Martin.

128. Martin, in or around October 2021, ultimately sought a leave of absence due to anxiety she has suffered due to race-based discrimination against her by Defendants' staff.

129. Martin commenced her approved leave of absence on November 1, 2021.

130. As a result of the Defendants' actions, Martin was unlawfully treated, humiliated, degraded, victimized, embarrassed, and emotionally distressed.

131. As a result of the acts and conduct complained of herein, Martin has suffered a loss of income, the loss of a salary/pay, special damages, loss of employment, loss of employment opportunities, loss to benefits and other compensation which such employment entails, and Martin has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

132. As a result of the acts and conduct complained of herein, Martin has suffered and will continue to suffer emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Martin has further experienced severe emotional and physical distress that adversely affects her day-to-day wellbeing and health.

133. Defendants' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Martin demands Punitive Damages as against Defendants.

## FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

134. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

135. 42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

136. As described herein, the Defendants discriminated against Plaintiff on the basis of her race, in violation of Title VII, by subjecting her to continued disparate treatment and creating,

fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment even after internal complaints were made by Plaintiff to various supervisors of the Defendants.

137.   As a result of the unlawful discriminatory conduct of the Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

138.   The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RETALITION UNDER TITLE VII**

139.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

140.   42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

141.   As described herein, Plaintiff engaged in protected activities, including but not limited to, making internal complaints regarding discrimination.

142.   As described herein, after Plaintiff engaged in activity protected by Title VII, the Defendants took adverse actions against Plaintiff that would cause a reasonable employee

from making or supporting a similar complaint of discrimination.

143. Following Plaintiff's complaints, Plaintiff was subjected to a worse hostile environment permeated with discriminatory ridicule, comments, insults, harassment, adverse employment actions, and other retaliatory behavior.

144. As a result of Defendants' retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

145. Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**THIRD CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE NYSHRL**

146. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

147. Executive Law § 296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

148. As described herein, Defendants discriminated against Plaintiff on the basis of her race in

violation of NYSHRL, by subjecting her to disparate treatment and creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment.

149.   As a result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

150.   As a result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

151.   Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE NYSHRL

152.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

153.   Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

154.   As described herein, Plaintiff engaged in protected activities, including but not limited to, voicing, drafting and filing internal complaints regarding discrimination to Defendants'

supervisors.

155.   As described herein, after Plaintiff engaged in activities protected by the NYSHRL, Defendants took adverse employment actions against Plaintiff that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

156.   As a result of Defendants' retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

157.   Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NYCHRL

158.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

159.   New York City Administrative Code §8-107(1) provides that it shall be an unlawful discriminatory practice:

> [F]or an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

160.   Defendants engaged in an unlawful discriminatory practice in violation of the New York

City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, a hostile work environment and otherwise discriminating against Plaintiff because of her race.

161. As a result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

162. Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

### SIXTH CAUSE OF ACTION
### FOR RETALIATION UNDER THE NYCHRL

163. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

164. The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

165. Defendants engaged in an unlawful discriminatory set of practices in violation of the NYCHRL by discriminating and retaliating against Plaintiff for her opposition to the unlawful employment practices of the Defendants.

166. As a result of Defendants' retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

167.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

168.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, the NYSHRL and the NYCHRL in that Defendants discriminated and retaliated against Plaintiff on the basis of her race;

B.    Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injuries to her reputation in an amount to be proven;

D.    Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F.    Awarding pre-judgment and post-judgment interest, as provided by law; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy the Defendants' unlawful employment practices.

Dated:  Garden City, New York
        February 24, 2023

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By:      _/s/ Joshua M. Friedman_____
         Joshua M. Friedman, Esq.
         585 Stewart Avenue, Suite 410
         Garden City, New York 11530
         T: (212) 248-7431
         F: (212) 901-2107
         jfriedman@tpglaws.com
